**Ralph HOWARD and wife, Kay F. Howard, Plaintiffs,**

v.

**SEARS, ROEBUCK AND COMPANY, Defendant.**

**Civ. A. No. H74–85(R).**

United States District Court, S. D. Mississippi, Hattiesburg Division.

Sept. 2, 1977.

Leonard B. Melvin, Jr., Melvin & Melvin, Laurel, Miss., for plaintiffs.

Francis T. Zachary, Zachary & Gillespie, Hattiesburg, Miss., for defendant.

## OPINION

DAN M. RUSSELL, Jr., Chief Judge.

Plaintiffs, husband and wife, residents of Ellisville, Mississippi, at the time their cause of action arose, brought this action under Mississippi's "wrongful death statute", Section 11–7–13, Mississippi Code of 1972 (formerly Section 1453, Mississippi Code of 1942) against Sears, Roebuck and Company, a New York corporation qualified to do business in Mississippi, for the death of their son, fatally burned when a Sears Coldspot freezer allegedly exploded and caught fire. Plaintiffs claim they are enti-tled to recover under theories of (1) strict tort liability because the freezer was defective; (2) breach of warranty, both express and implied; and (3) negligence in the design of the freezer in that its insulation consisted of polyurethane foam, a substance dangerous because of its flammability, and (4) because the freezer was negligently and improperly installed by Sears' employees. The defendant denied all charges.

The case was tried to the Court without a jury.

At the conclusion of plaintiffs' case in chief, Sears moved for a dismissal under Federal Rules of Civil Procedure, Rule 41(b), which the Court denied. At the conclusion of all the evidence, Sears again moved to dismiss, charging that plaintiffs, upon the facts and the law, had no right to relief. The Court reserved ruling on this motion pending its review of the evidence. Both plaintiffs and the defendant have furnished the Court with their respective proposed findings of fact and conclusions of law and briefs.

In a pre-trial order entered into evidence, the parties agreed that certain facts were established by the pleadings, stipulations or admissions of counsel. These facts, as adopted by the Court, follow.

Mark R. Howard, the infant son of the plaintiffs, was eleven months old on October 7, 1971 and in good health when he received fatal burns in the residence of Benton C. Pitts and wife, Martha Gay Pitts, Ellisville, Mississippi, where he was being cared for by Mrs. Pitts for compensation. Mark died on November 4, 1971, approximately 28 days after the fire, at the University Hospital, Jackson, Mississippi to which he was taken for treatment immediately following his burns. He had a life expectancy of 68.3 years. His parents, Ralph Howard and Kay F. Howard, plaintiffs herein, were the sole and only heirs at law of the deceased. Medical expenses incurred in Mark's treatment include the sum of $6,727.00 owed to University Hospital, $28.50 to Jones County Community Hospital, $505.00 to Dr. Rich-

ard C. Miller, $25.00 to a Dr. McRae, and $96.25 to City of Laurel Ambulance Services. Funeral expenses were in the sum of $733.25.

On and prior to October 7, 1971, there was situated in the residence of Mr. and Mrs. Pitts a Sears Coldspot Flash Defrost Spacemaster Chest Freezer, Serial No. 91839576, Model 1047. During this time Sears was engaged in the distribution and sale of freezers, including the one purchased by the Pittses. Sears made no reference to a manufacturer other than Sears, Roebuck and Co. on the freezer and the materials distributed therewith, and Sears marketed the freezers to the general public under its trade name of Sears Coldspot.

Also by stipulation of the parties, exhibits P–1 through P–65 were entered into evidence by the plaintiff, and exhibits D–1 through D–90 were admitted into evidence on behalf of defendant, both sets without objection by either party as to authenticity or admissibility.

Plaintiffs' first witness was Mrs. Martha Gay Pitts, primarily a housewife who, at home, assisted her husband in keeping books for clients other than his regular employer, and who "babysat" other persons' children in her home for a small fee. She identified her residence on Fridge St., Ellisville, as reflected in photographs in evidence, showing outside views, and a floor plan of the various rooms, also in evidence. In November 1970, Mrs. Pitts and her husband went to the Sears' retail store in Hattiesburg, Mississippi, where they purchased a Sears' Coldspot chest freezer, the serial and model numbers being that given above. Although the freezer was a floor model and had a scratch across the front, the salesman represented it as new, and they were given a written one year warranty, free, against defects in material or workmanship, as well as other literature, all in evidence, pertaining to Sears' household appliances. Final payment, by check, was made in January 1971. The freezer was delivered to the Pitts' residence in the week following the purchase by a Sears' delivery truck at a time when Mrs. Pitts was alone. She instructed the two men on the truck, both Sears' employees, to place the freezer at the center of the south wall of the dining room where a double two-prong, twist-lock receptacle was available. Inasmuch as the power cord on the freezer had a three-prong plug, the Sears' employees obtained from the Sears' truck a two-prong adapter plug with a "pig-tail" ground wire affixed, which they added to the power cord and inserted in the wall receptacle. They did not ground the "pig-tail" or say anything about it to Mrs. Pitts. She had no problem with the freezer until about two weeks after its purchase when she noticed that the lid did not fit tightly and was letting cold air escape. Upon her calling the Hattiesburg Sears' store, a repairman went to her residence and installed a new gasket around the lid. She did not watch him make the repairs but went about her household duties. She signed a repair slip. From then on until the day of the fire, the Pittses had no more trouble with the freezer. They used it solely to freeze vegetables and meats, and, on the day of the fire, Mrs. Pitts estimated that the freezer was half-full.

Beginning with the school year in September 1970, Mrs. Pitts had regularly assumed the day-time care of Mark Howard, the eleven month old child of plaintiffs, both parents being teachers in the Ellisville schools. On school days, Mrs. Howard would leave Mark with Mrs. Pitts at about 7:30 a.m. and pick him up after school in the afternoons. Mrs. Pitts would feed the child breakfast and lunch and keep him comfortably dressed. In return she was compensated the sum of $2.50 per day. On the morning of October 7, 1971, Mrs. Pitts had fed Mark and dressed him. Some ten or fifteen minutes before 11:00 a.m., Mrs. Pitts finished her preparations for lunch, left the kitchen, south of the dining room, and proceeded through the dining room and living room to a bedroom on the front of the house adjacent to the living room where she sat posting checks in connection with her husband's bookkeeping. Her own son, Michael, then twenty-two months old, and Mark were playing in the kitchen-dining

room area. Mark, who was not old enough to walk unassisted, was in a stroller, following the older child as they would move back and forth. At approximately 11:00 a.m., Mrs. Pitts heard an explosion "like a cherry bomb" from the vicinity of the dining room that shook the house. She ran from the bedroom to the living room where she ordinarily would have a clear view into the kitchen. She saw Michael in the dining room running toward her and had an instantaneous glimpse of Mark just beyond the doorway between the dining room and kitchen, about three feet from the kitchen space heater, when a blast of yellow flame from the bottom of the freezer swept upwards, across the back of the freezer and across the doorway to the kitchen blocking her view into the kitchen and preventing her getting to Mark. Before the sheet of flame blocked her view she had seen no fire in the kitchen. She picked up her child and ran out the front of the house around to the back kitchen door to get to Mark. She was prevented from entering by fire and thick black smoke. She noted that most of the flame was coming from the east wall of the kitchen over the space heater. She ran back to the front of the house just as her next door neighbor to the west, Mrs. Linda Graham, arrived. Mrs. Graham, a friend as well as next door neighbor to Mrs. Pitts, testified that she heard the explosion and a scream. She recognized a second scream as that of Mrs. Pitts. Mrs. Graham looked out the east window of her bedroom and saw smoke pouring out of the Pitts' dining room. She called the Ellisville Fire Department and ran out her back door to the front of Mrs. Pitts' home where Mrs. Pitts was again trying to enter. After ascertaining that Mark Howard was the only child in the house, Mrs. Graham tried to enter from the front but said there was so much fire and smoke in the dining room around the walls and freezer she could not get through to the kitchen. She then ran to the back and could not at first enter because of fire and smoke in the kitchen. She heard a whimper, got flat on the floor to crawl in, but still could not get to Mark. She got a hoe from under the back porch and on her stom-

ach was able to hook the hoe to the stroller and pull it and Mark with her as she slid backwards out of the kitchen. She did not believe she could have gotten by the space heater had it been on fire, and she was not burned. The child was unrecognizable from its burns. She sent someone for a blanket and to call an ambulance. By this time people were gathering around the Pitts' home, among them a licensed practical nurse who assisted Mrs. Graham in looking after the baby. In a few minutes, when an ambulance had not arrived, another bystander offered her car which Mrs. Graham and the nurse used to take Mark to an Ellisville doctor. There the baby was packed in ice and taken by ambulance to the Jones County Community Hospital, Laurel, Mississippi, and from there to the University Hospital, Jackson, arriving within three hours of the time it was burned and where the child died 28 days later.

In her testimony, Mrs. Pitts, on the floor plan in evidence, showed that the house faced north. She identified the various rooms, indicating the location of the freezer approximately four inches out from the south wall of the dining room, located five space heaters in the home, including the one at the east wall of the kitchen near the back door, none being in the dining room, and marked the places where she first saw both children following the explosion. This sketch also shows the location of a hot water heater in a bedroom east of the kitchen. Going north from the space heater, there is a door opening into this bedroom from the kitchen immediately south of the hot water heater in the northwest corner of the bedroom, both the door and the hot water heater being nearer to the door to the dining room than the space heater in the kitchen. The only furnishings in the dining room were a baby bed against the north wall, a dinette table in the center of the room, and six chairs, four around the table, and one on each side of the freezer. The power cord extended easterly from the lower right rear of the freezer along the back of the freezer near the baseboard of the south wall to the double twist lock

receptacle in the south wall, some eighteen inches to two feet above the baseboard. Mrs. Pitts occasionally ironed in the dining room near the entrance to the kitchen and used the lower receptacle for her ironing cord. She was not ironing on the day the freezer burned. As to it, Mrs. Pitts said neither she nor her husband had ever activated the defrost system, which was not automatic, had not had any trouble with the freezer since the lid gasket had been replaced by Sears' employees two weeks after their purchase, and that there had been no other repairs on the freezer. She said she had not laid clothes or anything else on the top of the freezer nor had it been misused in any way. On the morning of the fire, Mrs. Pitts said the weather was pleasant. Both the living room front door and the back door to the kitchen were open. None of the space heaters had been lit since the winter before. The knobs or handles to the various space heaters had been removed as a precaution against children playing with them, and these knobs were customarily kept in a kitchen cabinet out of the reach of the children, and were that morning. Her stove was operated by electricity, the space heater being the only gas appliance in the kitchen. Mrs. Pitts identified numerous photographs, in evidence, showing the charred and burned area behind the freezer with fire and smoke damage on the floor, baseboard, and wall with flame patterns swirling toward the kitchen, the metal back of the freezer itself which had obviously been exposed to tremendous heat, and the power cord burned completely through, laying at the foot of the baseboard. She acknowledged that there was a similar burn and charring behind and above the kitchen space heater as reflected in other photographs in evidence. After the removal of Mark to the hospital and the arrival of the fire trucks, Mrs. Pitts, in shock, went to Mrs. Graham's home. She did not return to her own home until late that evening, after a second fire had broken out and had been extinguished. Some weeks or months after the fire, Mrs. Pitts and an insurance adjuster went through the home which had not been repaired. She acknowledged that she signed a loss notice and claim report, in evidence, but denied that she attributed the fire and smoke to the explosion of the gas space heater, as appears on the notice but not in her handwriting. She knew the fire had started at the freezer as that was where the explosion occurred and where she first saw fire before the fire entered the kitchen. Because a fireman had said the fire started at the space heater, Mrs. Pitts had requested the gas company within a few days of the fire, to check for leaking gas, and no leak was discovered.

After returning from taking Mark to Ellisville, Mrs. Graham said that she and another neighbor, Mr. Aubie G. Richards, examined the Pitts' home closely. Smoke damage was throughout the house, with fire damage being confined to the dining room and kitchen. Mrs. Graham said the metal back of the freezer was distended, "blown out like a balloon", with the wall from the baseboard to the ceiling black and charred. Glass from a window to the west of the freezer was broken and shattered on the floor. East of the freezer, the door casing leading into the kitchen was burned, top and bottom, and the floor tile from the freezer into the kitchen was burned. The only damage she noted in the kitchen was above the space heater. That same afternoon around 2:00 p.m., Mrs. Graham noticed smoke coming out of the Pitts' attic from a vent at the front. She again called the fire department and went to the residence herself. This time the fire was in the ceiling over the dining room with no flame visible until the firemen chopped a hole in the ceiling. The fire was rapidly extinguished. Mrs. Graham acknowledged that the Pittses have not lived in the home since.

Plaintiffs' third witness was Aubie G. Richards who lived on a hill one block east of the Pitts residence. On the day of the fire, around 11:00 a.m., Richards heard a noise like a backfire and heard women screaming from the direction of the Pittses. He went to the scene, and, knowing that Mrs. Pitts often kept children, tried to find out if any more children were in the home. He said Mrs. Pitts way lying in the yard,

the burned baby on the back porch with two women looking after it, and he was unable to get a coherent answer. He entered the home from the back and proceeded through to the front. He found no other children. The house was full of smoke, but he saw little fire. He nonetheless took a water hose to douse the fire around the doorway between the dining room and kitchen and by the freezer. He could not remain inside for long at a time because of the density of the smoke. While he was so occupied, a fire truck arrived and someone took the baby to the hospital. Richards was aware of the location of the kitchen space heater, but did not note whether it was burning. He smelled no gas. He, too, identified photographs in evidence showing fire damage in the dining room in the area of the freezer and doorway. He did not remember spraying water on the kitchen wall behind the space heater and said, had it been flaming at the time he entered looking for children, neither he nor anyone else would have been able to enter by way of the back door which was adjacent to the heater. Around 2:00 p.m., Richards, too, saw smoke coming out of the attic of the Pitts' house. Using a ladder at the back porch, he accompanied a fireman, "Sonny" Patterson, into the attic to assist in putting the fire out.

Leslie Busby, by trade in the heating and air conditioning business since World War II, was the builder and owner of the Pitts' residence and sold it to the Pittses in 1968. Within a few days of the fire he was asked by Mr. Pitts and Pitts' father to check the damaged freezer and to check for gas leaks in the gas pipes to see if Busby could determine the source of the fire. Busby, in the company of both Pittses, looked at the freezer, and said it looked like it had "blowed out". The metal was not fractured or torn but bulged. He did nothing to or with it. He checked the space heater in the kitchen with the flame of a cigarette lighter and determined there were no leaks in it or its connections. With the knob or handle furnished him by the younger Pitts, Busby turned on the gas to the space heater. It lit and burned with a blue flame. Busby went under the house and, with his companions squatting down watching him, he, again with a lit cigarette lighter, checked all gas lines and every connection. He found no leaks. He recommended that Pitts get a man from Laurel by the name of Long, who was familiar with freezers, to examine the freezer. Busby saw the evidence of the fire behind the freezer and where fire had traveled from the freezer along the floor to the door into the kitchen and behind the space heater. Busby identified the space heater in the kitchen as one he had installed. It was well away from the wall and had a shield on it which Busby had installed. He said there was no way to turn the gas flame high enough for the wall and floor beneath to char as they did, particularly with the shield which would have deflected heat out and away from the wall.

Plaintiffs' next witness was William Jack Hays, Jr., an employee of Entex in Laurel. After the fire, he received a work order for a shut-in gas check of the Pitts' home. He responded to the call, and Mrs. Pitts confirmed that she had requested the check of the Pitts' home. First, Hays examined all the heaters in the house, then shut off all gas lines leading into the house, and turned off the pilot light to a hot water heater located in the northwest corner of the southernmost bedroom adjoining the kitchen on the east. He stated that every gas meter has a test hand which indicates gas is being used. With all the gas turned off in and about the house, he watched the test hand for 20 minutes, a standard test, and it did not move, indicating that there was no leak in the gas system or in any of the heaters. With a gas regulator, he had determined that there were four ounces of pressure in the lines at the time he watched the test hand. His inspection report, in evidence, reflects that he ran these tests on October 21, 1971, two weeks after the fire. He did not recall seeing the shield behind the kitchen space heater, but in his opinion the flame could not be turned high enough to have caused the charring that he saw behind the heater.

Benton Pitts, husband of Martha Gay Pitts, confirmed that they had bought the house from Lester Busby in 1969 with all five space heaters hooked to natural gas lines. They had had no problems with any part of the gas system or space heaters. He, like his wife, said they kept the knobs or handles to the space heaters in a kitchen cabinet where they were not accessible to children. Together they bought the freezer from the Hattiesburg store after it had been represented to them as new, the salesman knocking $20.00 off the full price because of a scratch across the front. Pitts was not home when the freezer was delivered and installed; nor was he at home when a Sears' repairman replaced the lid gasket and a small red light that was supposed to burn all the time but had become loosened. No other repairs or maintenance was had while the freezer was in their possession. He was at work as an accountant for Sanderson Farms when his mother called him about the fire. He immediately drove the five miles to his home. He briefly looked at the damage in the house before going next door to Mrs. Graham's home to check on his wife. From there he drove to the hospital in Laurel where he remained with the Howards until Mark was placed in an ambulance for transport to University Hospital in Jackson. On plaintiffs' photographs in evidence, he noted where fire had been around and back of the freezer with a burn pattern on the floor leading into the kitchen. The back of the freezer was bulged and the power cord, burned completely through, was laying by the baseboard. He identified photographs of the burned two pieces of cord and the adapter which had been placed on the plug end by Sears. He said that the tile covering on the dining room and kitchen floors was the same pattern with the floor level through the doorway to the kitchen. In defendant's photographs in evidence he identified the burned and charred areas in front of the kitchen space heater and the wall behind as representative of what he saw after the fire. He also said that the knob was not on the space heater at the time of the fire. Although it appeared to him that the fire had started behind the freezer and led into the kitchen, he did not know the initial source of the fire. He gave this as his reason for calling Busby, who had sold him the house, to check the freezer and the gas lines. Mrs. Pitts also had called Entex for the gas check, and on Busby's recommendation, Pitts called William A. Long of Ellisville, experienced in heating and air conditioning, to check the freezer. Under cross-examination, Pitts said he did not call Sears as he would have expected Sears to pick up the freezer and he would never have seen it again. Within a few weeks after the fire, he turned his fire loss claim over to plaintiffs' attorney. He did not know why the Howards' suit was not filed until three years after the fire, nor did he know why the photographs taken on behalf of the plaintiffs were primarily of the dining room, the freezer, and its various parts, and not of the kitchen.

On the day of the fire and, after Pitts returned to Ellisville from seeing the Howards, he was at his father's home when he was called that his house was afire again, this time in the attic. He went to his home and saw smoke coming out of the attic. He identified from a photograph the hole in dining room ceiling near the kitchen which was chopped by the firemen during the second fire, not the first. Also he removed the frozen meat and vegetables from the freezer which he said had not thawed.

Pitts affirmed his wife in saying they did not return to live in this house after the fire. It remained unrepaired at the time he sold it in March 1972. Neither Pitts, his wife, Busby, nor anyone else who testified, knew what had became of the space heater. Pitts said he sold it with the house.

William A. Long, in the heating and air conditioning business since 1968, got a service call during October 1971 to inspect the freezer in the Benton Pitts' home. He had never before been in the home and expected a repair job of some sort. He could tell that the freezer had obviously been in a fire and was not operational because of the burned cord. He visually examined inside the freezer around the motor and found a

pressure of 58 psi (pounds per square inch) equal on the low and high side of the compressor which he said was normal. In order to make this test, he had to remove two service ports which customarily are not on a freezer which has come straight from the factory, the ports indicating that the lines had been previously serviced. He also found a slight freon leak.

During the testimony of these witnesses, various experts, both for the plaintiffs and the defendant, were allowed to remain in the courtroom.

The first witness offered by plaintiffs as an expert was Dr. C. T. Carley, Jr., a full professor and head of the Mechanical Engineering Department of Mississippi State University, Starkville, Mississippi. The Court accepted Dr. Carley's qualifications as an expert in the field of mechanical engineering with knowledge of refrigeration systems and the use of various kinds of insulation including polyurethane. However, by his own admission, his experience in the design and manufacture and use of insulation in freezers of the type here involved was limited.

Dr. Carley first saw the Pitts' freezer on September 30, 1974 after receiving a call from plaintiffs' attorney. He and a mechanic on his staff, Thomas Didlake, went to the Pitts' home in Ellisville. The freezer was scorched and burned on the back as reflected in plaintiffs' photographs. The power cord was burned in two parts, laying on the floor behind the freezer. A filler plug, used at the factory to inject the liquid polyurethane into the freezer as insulation between the inner metal cabinet and the outer metal casing, located on the right rear bottom of the freezer, was deflected downward, its left end still attached to the parent metal. A similar plug, under the front of the freezer, remained flush with the metal. After visually examining the freezer, Dr. Carley observed the fire damage to the house and the electrical system, which included a simple type breaker box. He noted the two-prong adapter and grounding wire on the end of the power cord to the freezer. At his request the freezer, along with the power cord pieces, was removed from the Pitts' home in Ellisville to Didlake's garage in Starkville in order that they could examine them more closely. This examination took place in June 1975. They noted that the burn on the bottom of the freezer outside casing was similar to and led to that on the rear of the outer casing. Dr. Carley suspected that the insulation between the two metal cases had burned causing a blow-out. By cutting through the rear outer casing, Dr. Carley was able to note the blackened and charred insulation extending from the bottom rear of the freezer upwards in contrast to the white solidified foam insulation next to the inner casing and outside the burned area. The inner wires of the defrost system and condenser coils that were visible were badly corroded. He noted that the two pieces of the burned power cord matched, and that the three-strand copper wire exposed at one end where the insulation was burned off had beaded, indicating a hot fire. He suspected a short circuit from the evidence of copper in the burn area of the outside rear panel near the bottom where blisters were evident in the metal. He sent scrapings from this area to the chemical laboratory at the University. However, the subsequent report was that the traces of copper were insignificant. He noted that the defrost system could be activated by pulling a knob visible in the raised lid of the freezer. He removed the inner liner of the lid in order to inspect the defrost system. It consisted of a switch hooked to two thin wires that encircled the inner box several times, portions of which were visible when he removed the back of the outer liner, but most of which was not visible. At some time in his inspection and handling of the freezer, Dr. Carley inadvertently broke a part of the defrost wire that was visible and said that he soldered it together. As to the defrost switch, he noted that it was held together by a rubber band. When the band was removed, the switch fell apart. After putting the switch back together and replacing the rubber band, Dr. Carley attempted to energize the defrost system by pulling the defrost knob. He got a slight initial heat-

ing of 15 seconds, then nothing. He called in an electrician, Conger Hall Jones, to check the electrical continuity of the switch and defrost system who tested same by attaching an ohmmeter to one end of the defrost wiring, then to the other end. From the ohmmeter readings, which he saw himself, Dr. Carley determined there was a short circuit in the defroster wiring in an area not exposed to view even after removing the back outer casing. As to the polyurethane insulation, Dr. Carley undertook to test its flammability by inserting unburned portions, which he removed from the freezer, into a 3″ pipe. He inserted another pipe and applied flame. When heat of 200 to 300° Farenheit was reached, the polyurethane began to vaporize. There was no flame at that temperature. When the heat was increased to 400 to 500° Farenheit, ignition did occur but the flame died down within seconds. At the suggestion of Mr. Clayton Schneider, another expert witness for plaintiffs, Dr. Carley placed a sample of the polyurethane in an oblong pan to while he clamped a cover. He placed a small hole in the bottom. He exposed a propane torch with over 780° Farenheit to the bottom and obtained vapor; then a yellow flame shot out of the bottom hole and continued to burn for several minutes, charring a piece of wood approximately three to four inches from the bottom of the pan, the same distance the freezer was out of from the baseboard and wall in the Pitts' dining room. This test is reflected in plaintiffs' exhibit No. 73, a photograph taken by Dr. Carley himself. Although he obtained a flame at 780° Farenheit, he noted that the flame behind the freezer obviously reached as high as 1900° Farenheit, the degree necessary to cause the beading of the copper wires in a burned end of the power cord which would have been in the vicinity of the filler plug. In addition to the erratic and damaged defrost switch which he said may have caused an electrical short, Dr. Carley, on the basis of the ohmmeter test on the defrost circuitry which reflected a short, said that the short could have occurred in the defrost wiring imbedded in the polyurethane insulation in the vicinity of the bottom and back of the outer casing, with sufficient heat to initiate the degradation or pyrolyzation of the polyurethane, and, when this matter vaporized, it built up sufficient pressure in the freezer until it exploded out the point of least resistance, that is, the filler plug, and ignited in a yellow flash fire, as described by Mrs. Pitts, spewing flame downward out of the filler hole, some toward the window that was broken, up the wall behind the freezer and around westerly toward the door into the kitchen, and some westerly along the baseboard into the kitchen, all as reflected in the flame pattern evident in plaintiffs' photographs, in evidence. Alternatively, Dr. Carley was of the opinion that the power cord in back of the freezer arced against the outer casing in the vicinity of the filler plug, building up sufficient heat to vaporize the polyurethane which ejected from the filler hole at a high enough heat to self-ignite causing the same flame pattern as though the polyurethane was caused to pyrolyze and ignite from a defroster wire short within the casing. In speaking of a short in the defroster wire as opposed to an arc in the power cord, Dr. Carley explained that the defroster wire did not necessarily have to break, but only had to come in contact with some other substance so that the electrical current would take a route other than that intended. He felt that the short, wherever it occurred inside the freezer, dissipated heat to the back of the box near the filler plug and in the same vicinity as where the power cord burned in two pieces outside the freezer.

In September 1974 when Dr. Carley visited the Pitts' house, his attention was not called to the charring of the kitchen wall behind the natural gas space heater and floor beneath. The record does not reflect whether repairs had been begun in the kitchen at that time. Be that as it may, after he was shown photographs entered into evidence on behalf of the defendant reflecting as much as and the same type of charring in and around the space heater in the kitchen as shown in plaintiffs' photographs of the wall and floor in the dining

room behind the freezer, it was his opinion that the fire in the kitchen and the fire in the dining room occurred at practically the same time, and the polyurethane vapors exiting the filler vent, if not hot enough to ignite, drifted through the kitchen door into the bedroom on the left where the pilot light on the hot water heater furnished the ignition, the flame traveling back to the freezer with sufficient heat present to burn the power cord through and to cause the burning and charring behind the freezer. He explained that polyurethane, when ignited, casts a yellow flame with a lot of soot, the latter having been mentioned by the witnesses who saw the fire, as well as being reflected in the photographs. On the other hand, had natural gas escaped from the space heater in the kitchen and drifted into the dining room behind the freezer, and had there been exposed to a source of ignition, he felt that the gas would have "whooshed" back to its source, would have been a clean burn, insufficient to have caused the charring to the polyurethane and wall and leave the amount of soot behind the freezer, which polyurethane produces on burning and which is evident in plaintiffs' photographs. Returning to a short in the defrost wiring Dr. Carley said that it obviously did not occur next to the inner lining inasmuch as Mr. Pitts was able to save the frozen foods in the freezer, but, if such a short occurred, it was where the polyurethane had charred all the way through, that is, near the filler hole. At the same time he acknowledged that if there were no short in the defrost wiring, the eventual heat produced at the freezer had to be high enough to bead the copper wires in the power cord, such heat having to come from a spark or arc in the power cord outside the freezer or from some other source. Summarizing his testimony, he felt that polyurethane, being highly combustible, was a dangerous product to be used as freezer insulation, although he conceded that all appliance manufacturers were continuing to use it without the addition of flame retardants. He could not determine whether the polyurethane pyrolyzed from a source inside or outside the freezer, but stated that the fire behind the freezer had all the characteristics, that is, yellow flame and soot, of a polyurethane fire. For this to happen, obviously there had to be a source of ignition which he felt came from either the broken defroster switch or a short circuit in the electrical system. He thought it probable that the combustible polyurethane vapor drifted from the dining room into the kitchen and through a bedroom door and ignited from the hot water heater pilot light, even though there was no visible fire damage to the water heater or carpet underneath. He discredited the theory that natural gas escaped from the space heater in the kitchen, which would have to drift by the hot water heater first and then drift further to the back of the freezer to be ignited by the freezer relay inasmuch as the relay was enclosed. If natural gas so escaped, and was ignited by a short in the freezer, he felt that the burning gas would have "whooshed" back to its source, leaving no residue, and could not have caused the obvious charring of the wall behind the freezer, and smoke and soot which Mrs. Pitts said was everywhere. Dr. Carley did not know who put a rubber band around the defrost switch to hold it together, nor did he know who had serviced the freezer as evidenced by the addition of the service parts, but he assumed that it was Sears inasmuch as the Pittses testified that only Sears employees had serviced the freezer while it was in their possession.

Conger Hall Jones, an electrical engineer on Dr. Carley's staff, was asked by Dr. Carley to run a continuity test on the freezer. He prepared his own diagram of the circuitry and compared it with one of the freezer which had been furnished him. He found no inconsistencies between the two. To test the circuitry, he used a Simpson Volt-ohmmeter which measures voltage, resistance and current. Under Dr. Carley's supervision, he first ran a test on two burned out leads in the defrost system [1] and found only 26 ohms resistance in the whole

---

1. The defrost wire was inadvertently broken by Carley, but later repaired.

coil. He then tested from a coil to the outside metal casing and got a reading of 8000 ohms resistance, indicating a short between the wiring and casing. He also examined the defrost micro-switch held together by a rubber band and said when the rubber band was taken off, the switch fell apart. When he and Dr. Carley put it back and inserted it in place in the freezer lid, Jones said it fit in tightly, and, when in place, was "all right".

Clayton J. Schneider, Jr., East Aurora, New York, also testified on behalf of plaintiffs as an expert in pyrotechnics. Schneider holds a Bachelor's Degree in chemical engineering from Renessler Polytechnic Institute. He has had a number of years experience with private industry in the development of industrial materials including polymer derivatives, and, as a bench chemist, had formulated polyurethane foam. He has studied the combination of solids, liquids and vapors, and their characteristics for combustion. He has studied and written on safety practices in the polymer industry. For the last sixteen years, his field has been in the area of pyrotechnics, having performed research for the military and lectured on incendiaries. He is currently on the staff of Cal-Span Corporation connected with Cornell Acronautical, Inc. He also consults privately and has made numerous federal and state court appearances in regard to house and appliance fires and arson.

In connection with the Pitts' freezer, he was first furnished an electrical diagram of it in the spring of 1975, as well as plaintiffs' photographs of the freezer, and a sketch and photographs of the Pitts' home reflecting fire damage. He visited the home in May 1975 at a time when it was being refurbished but could see the residual traces of fire on the south wall of the dining room through to the kitchen and behind the kitchen space heater. He noted the hole in the dining room ceiling but saw no damage under the house. He saw the damaged freezer the same day in Starkville, in the company of Dr. Carley and Didlake. It was laying on its front with heavily damaged and deeply charred polyurethane visible at the bottom and rear of the box and where the back of the metal casing had been peeled back by Dr. Carley and Didlake. He noted that samples had been removed. He explained that polyurethane is a closed cell, foam, liquid when injected by a mixture gun into the cavity between the two liners of the freezer, where it then hardens. He said that if low heat is applied, it assumes liquid state, but, undamaged foam, if ignited, burns rapidly, emitting brown or dirty smoke, leaving little ash. If containerized, as in a freezer, and heat is applied, the atomic structure breaks down, forms vapors and combustible gases, and, if high heat is applied, the change is rapid, the vapors and gases taking the path of least resistance to escape outward. On this freezer he said the material in front was as originally injected, but that in the back and rear the matter had changed in appearance from the application of heat. He found evidence of increased pressure in that the back filler plug had been blown outward. Following the heating in this freezer, he said the vapor built up in the contained areas, and the weakest portion gave way at the filler plug. He added that, if the vapor is released fast, an explosive noise would follow as it did in this freezer. Of the 13 pounds of rigid polyurethane in the freezer, he estimated that two or three pounds degraded. The release was rapid as indicated by the open filler plug, the witnesses who heard the explosion, and the charred condition of the wall behind the freezer. He estimated 25 to 30 cubic feet of pressurized vapor was released, and, if the combustible vapors were ignited, there would have been a blast of yellow flame. In response to the question had he found a source of ignition, his reply was in the affirmative—a highly probable source from an arc in the power cord to the outer metal skin of the freezer. Schneider confirmed that he recommended to Dr. Carley that a higher heat than Dr. Carley had first used be applied to the polyurethane which should be put in an enclosed container to more nearly approximate the freezer itself. In one of these tests performed in Schneider's presence, the enclosed pan was heated to 1000° Faren-

heit, sufficient to cause incandescence in the metal pan and more than enough to ignite the polyurethane. Schneider examined the two pieces of the power cord, saw that they matched, and said they evidenced an explosion at a high temperature, at least 1900° Farenheit, at which copper wires in the power cord melted and beaded. According to him this could have been caused only by intense heating at the back of the freezer, which degraded the polyurethane into vapors which built up sufficient pressure to break through the filler plug. The vapors were ignited while traveling up the back of the freezer, further degrading the polyurethane, resulting in a yellow flame. The initial heat as well as ignition was from an arc in the power cord outside the freezer to the metal casing, at or near the filler hole and where the cord was burned in two pieces. As a chemical engineer who had basic courses in electricity, he felt he knew the principles of arcing, and said whether the arc was the from the copper wire to metal skin or wire to wire touching the metal skin, either could generate enough heat to cause pyrolyzation. The resulting vapor created sufficient pressure to bulge out the back metal skin and blow out the filler plug, releasing vapor to expand to atmospheric pressure. The vapor ignited from the arc, or was hot enough to self-ignite, with burning gases rising above the top of the freezer and burning up the dining room wall as reflected in plaintiffs' photographs, particularly Nos. P–33, 34 and 35 which were taken shortly after the fire. At the time of these tests, Schneider did not know about the fire in the kitchen behind the space heater, nor was it evident in plaintiffs' photographs, his comment being that the kitchen fire was under-documented. He nevertheless felt from plaintiffs' photographs that the incident was within his expertise. Accordingly, he went to the Pitts' residence and examined for all traces of fire, as noted above, finding traces of soot, and, from the new flooring and new walls, could tell these areas were damaged, in the kitchen as well as in the dining room. He then went to Starkville to examine the freezer as related above. During the trial at which he saw defendant's photographs of the damage in the kitchen and videotapes of tests run by Whirlpool, including those on undamaged freezers, he found them interesting enough to double check his conclusions and found no reason to change them. He carefully examined the two pieces of the insulated power cord, in evidence as well as shown in defendant's photographs, and concluded there had to be a break through the insulation, even though that part burned, to represent the potential source of energy, saying there was nothing else to furnish the heat that the back of the freezer was exposed to. He found evidences of an arc from the power cord in the different colors in the burn on the back of the freezer. When asked why this arc did not break the 15 amp breaker in the fuse box, his reply was that a 15 amp breaker would allow enough voltage to let 1500 watts of current pass, sufficient to initiate pyrolyzation. Before the breaker would enter the picture, he felt enough heat would have been generated in seconds to begin degradation of the polyurethane insulation. The vapors which emitted by way of the filler plug then hit the power cord arc and ignited, or were hot enough to self-ignite, a process taking from a few seconds to no more than a minute. In his opinion, the vapors bursting out the filler plug would have resulted in an explosive noise, like a bang, and the burning of the vapor would result in a fast hissing sound. Simply put, Schneider said, had there been no arc against the outer casing, there would have been no explosion and fire. In his opinion, the fact that the pigtail wire on the two-prong adapter had not been grounded made no difference. On plaintiffs' exhibits Nos. 34 and 35, Schneider pointed out the flame was thrust downward and toward the west windows from the angle of the partially blown-out filler plug, then upward toward the ceiling, and along the ceiling and the baseboard toward the kitchen. He denied that the white area above the freezer shown on plaintiffs' exhibit No. 35 was a camera distortion saying that this white part was a part of the flame pattern that went over the entire wall. The Court notes that this same pattern is

depicted in plaintiffs' exhibits, Nos. 17, 32, 33, 34 and 45, Nos. 17, 35 and 45, incidentally, showing the location of the space heater through the doorway into the kitchen. By means of a mathematical formula used in the field of chemistry, Schneider concluded that the vaporous gas produced in the pyrolyzation of the polyurethane foam produced a flame covering an area of 50 to 90 cubic feet, saying that vaporization and ignition occurred over a period of minutes, reaching a point when vaporization lessened, ignition failed, and the fire burnt itself out. The Court notes that when the neighbor, Richards, reached the scene, the fire had died down except where the charred wooden wall and door facing still had some flame.

Summarizing Schneider's testimony, he heard Dr. Carley testify and agreed with him as to the combustibility of polyurethane vapors. They disagreed as to the initial source of heat to cause pyrolyzation, Dr. Carley believing a "hot spot" developed inside the freezer, and Schneider concluding that the source of heat started from a damaged power cord; nevertheless both agreed that polyurethane foam was directly responsible for the fire. Schneider offered no explanation as to how the power cord became damaged sufficiently to arc or spark.

Plaintiffs' next expert was Mr. Joseph E. Leininger, a graduate of Tulane University, New Orleans, Louisiana, with a degree in mechanical and electrical engineering. He professed years of experience in the design and sales of heating and ventilating systems for private industry; he also served as an engineer and facilities officer with the U. S. Navy, and is presently a consultant in mechanical and electrical engineering involving heating, air conditioning, plumbing, all mechanical systems, and in fire prevention and protection. He has, over a period of fourteen years, been involved in the investigation of fires for insurance companies and adjusters. He, too, has testified as an expert witness in litigation.

After first talking with plaintiffs' attorney in February 1975, Leininger went to Ellisville to examine the scene of the fire. The freezer had been removed to Starkville,

and although the Pitts' residence was in the process of renovation, he could still see traces of where the fire had been. He inspected the house electrical system including the distribution panel and the breaker box. He inspected where the space heater had been in the kitchen, the hot water heater in a bedroom leading into the kitchen, and the attic. In the attic, he removed some insulation so he could see the pattern of where electrical wires lay. While there he inspected the hot water vent, found the flue clean inside, and determined that it had not been exposed to great heat. He also inspected a simple pole circuit breaker and socket meter outside the residence where power had been cut off. He inspected the double receptacle in the dining room wall. Although sooty on the outside, the inside revealed no burn. At a later date, November 21, 1975, Leininger met with Dr. Carley to examine the freezer. The back outside casing had been removed, enabling Leininger to see inside and inspect the defrost system. He determined that the polyurethane insulation had been exposed to heat sufficient to cause pyrolysis. He also found the defrost wiring damaged, in that a piece was missing near the top of the freezer but in the damaged area. He tested the continuity of the electrical circuitry and found an open circuit in the defrost wiring. Referring to his examination of the Pitts' attic which showed no burning on the top of the attic fiber glass insulation and a little burning underneath, with slight damage to an electric cable underneath the fiber glass, and with no damage to the hot water heater flue, Leininger determined there was no source of fire in the attic. From his examination of the Pitts' home, the traces of soot in the dining room and kitchen, his inspection of the freezer, and his inspection of both plaintiffs' and defendant's photographs, he stated that it was obvious that the fire started in the freezer. In his opinion, the broken defrost wire inside the freezer supplied the initial heat for pyrolyzation to begin, with the source of ignition of the combustible portion of these vapors coming from an arc in the power cord laying along the back of the freezer. He saw

the two pieces of the power or extension cord, noted the copper beading which occurs when the wire is exposed to heat of 1900° Farenheit, more than sufficient to ignite the combustible vapors generated during pyrolyzation. He stated that polyurethane, not exposed to oxygen, will not burn, but once sufficient heat, 600° to 800° Farenheit, or up to 250° Celsius, is applied, polyurethane will pyrolyze, about 30 percent turning into vapors, half of which is flammable. He again said that the initial pyrolyzation of the polyurethane caused release of the vapors through the perforated filler plug, which when exposed to oxygen in the air, were ignited from the arc in the damaged power cord, causing an explosive noise and fire. When told that the broken defrost wire he had seen in the freezer was accidently broken by Dr. Carley and repaired by Dr. Carley, Leininger was still of the opinion that defective defrost wiring created a hot spot that gradually built up a temperature sufficient to cause pyrolyzation. He felt that the defrost wire, of low resistance, could have kinked, stretched or broken from the vibration of the compressor, causing electricity to go where it should not have. He estimated that it could have taken fifteen minutes to a half an hour or longer for the hot spot to generate heat up to 500° Farenheit for pyrolyzation to begin. He explained that from the circuitry diagram of this freezer, electricity normally enters by way of the power cord from the wall receptacle and goes either to the defrost system and back to the power cord, or to the compressor for cooling and back to the cord. When one system is energized, the other is not, if the system is working as it should. The defrost wires are designed to distribute heat evenly. However, if the defroster switch, which behaved erratically when Dr. Carley examined it, activated the defrost system, current should have flowed evenly. In Leininger's opinion, it did not, but built up at a hot spot. After Dr. Carley put the switch back together again and inserted it in place with a tight fit, both systems worked as demonstrated in the courtroom. Leininger pointed out, however, that this test was not run long enough to observe whether heat built up at a hot spot. When informed that a bi-metal thermostat in the defrost wiring system was designed to break the current at over 95° Farenheit, Leininger pointed out that this thermostat, in the upper portion of the freezer, had insulation between it and the hot spot in the lower part of the freezer and thus would not be affected by heat at the hot spot.

Although Leininger had not seen the space heater inasmuch as it had been removed from the kitchen when he inspected the residence, he had indicated in his deposition that the flame pattern in front and behind the heater, as reflected in defendant's photographs, came from the heater. When he learned during the trial that this heater had a shield behind it, he testified that he then doubted that the burn came from the heater. He further felt that if the space heater had been turned on, the natural gas would have first diffused into the bedroom where the hot water heater pilot light was on, yet he found no burn in the bedroom. In summarizing Leininger's testimony, he concluded that the erratic switch had activated the defrost wiring system in which a hot spot developed some fifteen to eighteen inches from the filler plug. When pyrolyzation began, vapors and gas built up enough pressure to explode out the filler plug. He admitted that the pyrolyzation would have had to go fifteen inches to the right and five inches downward before the heated vapors could damage the extension or power cord. He contended that the pyrolyzation process continued for some time before ignition was supplied by an arc or short in the extension cord.

Testifying last on behalf of themselves were Mr. and Mrs. Howard. Neither was present during the events leading up to the fire and during it. Necessarily their testimony was limited to the fact that Mark was their only child and son, a happy baby in good health. Mrs. Howard was not allowed to see her son from the time of his injuries until two weeks after his admission at University Hospital, and then for only five minutes during every hour. Although he

could not move much, she said Mark was responsive to her and her husband. She identified a color photograph of Mark made one week before he was burned. Mr. Howard was only allowed to see Mark one week after his admission to University Hospital. According to Howard, Mark's skin was charred, his fingers burned off and his ears crusted. Even on those parts of his body where the crust had been surgically removed, the underlying flesh was blackened. Burns covered his entire body except in the diaper area.

Following argument on defendant's motion to dismiss, which the Court denied, defendant first offered the deposition of Dr. Kurt Charles Frisch of Gross Ile, Michigan, taken on May 27, 1977 in Chicago, Illinois, in the presence of Mr. Schneider, one of plaintiffs' expert witnesses. This deposition is in evidence. Dr. Frisch was unable to appear in person at the trial which began on June 15, 1977 as he was in Europe. He holds graduate degrees in organic chemistry from the Universities of Vienna and Brussels and from Columbia University. He is and has been for the last nine years a full professor of polymer engineering and a director of the Polymer Institute at the University of Detroit, Detroit, Michigan. A lengthy list of his accomplishments is attached to his deposition. As a full time professor he teaches graduate students seeking master and doctorate degrees in polymer science and polymer engineering. As director of the Polymer Institute he is responsible for research in the polymer field, funded by international and private industry as well as the United States government. He explained that polymers deal with the science or technology of large molecules such as are found in plastics, rubber, coatings, films, and fibers and include cellular plastics such as polyurethane foam, both flexible and rigid. From his detailed experience Dr. Frisch has been unquestionably instrumental in introducing the use of polyurethane foam into American private industry where its use is now prevalent as insulation in building construction and as insulation in appliances such as the freezer involved herein made by the Whirlpool Corporation of Benton Harbor, Michigan, bearing a Sears' brand. He described the chemical make-up of polyurethane common to this type of foam as roughly sixty percent polyetherpolyols, and approximately thirty percent of crude toluene diisocynate (TDI). Remaining are two catalysts, tertiary amine which accelerates reaction, and a silicone surfactant which acts as a cell control agent, and a nonflammable blowing agent falling under the generic classification of fluorocarbons, particularly, trichlorofluoromethane. At his request a sample of the foam from the freezer involved was sent to him by Whirlpool in order for him to perform on it a test known as "Oxygen Index" which measures combustion. According to Dr. Frisch it is a standard test recognized by the American Society of Testing Materials, reproducible from one laboratory to another in which the test is carried out by increasing the amount of oxygen in an atmosphere of air, being oxygen and nitrogen, until burning starts. A value of 21 is the point at which the foam is considered as self-extinguishing.[2] On the sample sent to Dr. Frisch the oxygen index test performed under his supervision scored 19.5 Although this score did not reach the self-extinguishing point of 21, Dr. Frisch felt it relatively high. He added that a score of 19.5 compared favorably with the oxygen index of polyurethane foam used in the freezer industry in 1969 when the Pitts' freezer was manufactured, saying that the type and composition of the foam used in 1969 is essentially the same as currently used with no generic variations. He admitted that on an oxygen index scale to 21, a score of 19.5 indicated flammability which he said would have a relatively slow rate of burning as distinct from "highly flammable" which would be more likely in foam used in furniture, mattresses and for packaging. He acknowledged that in 1973 the Federal

2. Under cross-examination, Dr. Frisch conceded that foam at a value of 21, if exposed to direct flame, will still burn.

Trade Commission had filed suit against twenty-five companies in the plastics industry and the Society of Plastics Industry alleging the mislabeling of foams as "fire proof" or "self-extinguishing" in that industry tests did not reflect actual fire conditions, and admitted that the suit ended in a consent judgment, adding, however, that the suit was specifically brought with regard to foams used in the building and construction industry, which he did not consider the same as freezer foam. Despite the oxygen index test recognized by the Society of Testing Materials, a type of test he said was available in 1969, Dr. Frisch stated that there were no industry or government standards applicable to the use of polyurethane foam in freezers or refrigerators then and none today. As to this particular foam which he found typical of foams being used today, he did not consider it dangerous in any way in that it was enclosed in metal housing. He thought it significant that its use is increasing year to year in place of fiber glass. After examining pictures of the freezer, he conceded that the foam, such as used in this freezer, was flammable, characterizing it as slow burning. Like any other foam he said it would pyrolyze and in the pyrolysis, give off a number of degradation products, naming them as: (1) flammable gases which could burn if a source of heat was present; (2) non-combustible gases such as water vapor and carbon dioxide; (3) the formation of liquids which are partially pyrolyzed polymer; (4) char, which he felt desirable as it acts as a protective layer, preventing air or oxygen from coming into contact with combustible gases; and (5) smoke. He said the combustible gases at any given time would constitute but a few percent of the whole. From his examination of two photographs of the burned freezer, attached to his deposition, he was not surprised that "only a minor section of the total of foam was charred and seemed to have been consumed." He ruled out the possibility that the flammable gases given off by this foam could create a flash fire reaching a radius of eight to ten feet which could be expected from a highly flammable substance such as natural gas. Because the foam was encased in metal, he was of the opinion that the size of any flame exiting the filler hole could have been no more than "a couple of inches at the most", would be directed directly upwards, and did not produce an explosion, else the container would have shattered. He added that the only sound emitted would be a hissing sound as the foam (fluorocarbon) gas escaped.

Under cross-examination, Dr. Frisch admitted that during the process of pyrolyzation, pressure could have built up in the freezer, and it was obvious to him that there was flame inside the freezer. He was not familiar with the defrost system, but thought it highly improbable that it could have initiated flame inside the freezer. He conceded that polyurethane is more flammable than fiber glass but said the former was replacing the latter, not only because it was cheaper, but because it afforded more usable space for the user than fiber glass, and thus had a higher insulation value. At the end of his deposition, under re-direct examination, Dr. Frisch was of the opinion that the smoke given off during pyrolyzation would be a light smoke, a type that would not be dense, and which would not prevent discernibility of objects or persons in the room.

During his deposition, Dr. Frisch found occasion to say that he knew Dr. Shelby F. Thames, a nationally and internationally known scientist, who was defendant's first live witness. Dr. Thames of Hattiesburg, Mississippi with a doctorate in organic chemistry from the University of Tennessee, is currently teaching polymer sciences to graduate students at Mississippi Southern University, Hattiesburg, where he is dean of the college in sciences. He likened a scientist's construction of polymer to that of an architect responsible for the construction of a house. On a large courtroom blackboard, Dr. Thames wrote the formula for polyurethane, filling both sides without completing the formula. He received from Whirlpool a copy of its polyurethane formula similar to that on the blackboard. After examining the freezer, he determined that

its foam contained the same ingredients as the blackboard formula. He has made rigid foams himself although his major interest is in coatings and paints. He described the rigid foam, such as that in the freezer, as subject to thermal degradation, or pyrolysis, beginning at 250° Centigrade. During the process the rigid matter generates carbon dioxide (gas), TDI (liquid), propane (gas), and water (liquid). Of these propane and TDI are combustible. The carbon dioxide and water are not. Also generated are char and smoke. Percentage-wise the $CO_2$ (carbon dioxide), $H_2O$ (water), $C_6 H_6$ (propane) and TDI comprise .62% of the whole, leaving 99.38% polymer and char, as represented in plaintiffs' exhibits Nos. 5, 6 and 7. Of the .62% representing gases that went into the atmosphere, only one-half were combustible. From other formulas he determined that .01376 cubic feet of combustible gas pyrolyzed from one pound of foam. He had been told by Dr. Frisch that only two pounds of the freezer foam had pyrolyzed. In a dining room containing 1,229.44 cubic feet of room value, he concluded that the volume of flammable gases entering the atmosphere was too low to be combustible. He knew nothing about the electrical system in the freezer, could not tell whether pyrolyzation took place within or outside the freezer, and admitted that all his calculations were based on degradation at 300° Centigrade, 250° Centigrade being the lowest heat at which pyrolyzation begins.

Wyonie "Sonny" Patterson, with 21 years' experience as a fireman with the City of Ellisville, and two other Ellisville firemen, responded to the call that the Pitts' home was on fire. He testified that they arrived within 10 to 15 minutes. It took 30 seconds to set the fire truck up to pump water. While one fireman entered the house from the front, Patterson attempted to enter from the back. He saw a lot of heavy smoke with red and blue fire leaping out the back door, which suddenly died down. The child had already been removed. When Patterson first arrived, he said the main portion of the fire was around the space heater, although he could later see where it had led along the floor from the back of the freezer in the dining room. He identified his official report, in evidence, on which he and the other firemen concluded that the fire started at the space heater. He had smelled no gas, but stated that when natural gas was burning it had no odor and could not be put out by water. When he left the premises, he noted that the gas line into the house had been cut off outside the house. Under cross-examination Patterson admitted that he had told plaintiffs' attorney that the fire had started at the freezer and trailed to the space heater in the kitchen, and that the knob or handle was not on the heater. He said he did not examine the gas connection, but saw no fire damage or soot around the hot water heater. He verified that there was no fire in the attic during the first fire, but that they were called back in the afternoon for an attic fire at which time he knocked a hole in the dining room ceiling.

Richard Seib, a research engineer with Whirlpool since 1976, with a bachelor's degree in chemistry from the University of Evansville, Indiana, and currently working on his doctorate in organic chemistry, testified that he has been engaged in projects regarding the flammability of polymers, polyesters, coatings and paint furnishings. He professed familiarity with the chemical content of polyurethane used as the insulation in Whirlpool freezers, saying that there have been only slight changes since 1969, none affecting pyrolyzation. In preparation for this trial he worked through the chemical formula exhibited by Dr. Thames and agreed with it. He was advised of plaintiffs' allegations, was furnished a sketch of the Pitts' home, photographs of the freezer and burned areas in the dining room and kitchen. He and another Whirlpool employee ran eleven tests, video-taped and documented. He assumed an external fire, as apparent on the burned freezer in evidence, and, using several variables, tried to reconstruct what happened that caused the fire in the Pitts' home. The video-tapes, five in number, were shown in the courtroom and they, with a written description, are in evidence. Several of these tests

were simulated in a laboratory, and others were run on actual freezers, all the insulation, according to Seib, being identical to that in the burned freezer, except for added freon which increases density. In the first six tests a steel container of sheet stock, identical to the steel outer container of the freezer, was filled with polyurethane foam and flame was applied at or near a one inch filler hole. In the first test a meeker burner, with the air inlet taped shut and gas flow set at 43 BTU/M (British Thermal Unit per minute) was placed four inches below the center of the steel panel. A burning candle was placed one-half inch in front of the filler hole. With a timer set at zero, after eleven minutes and thirty-five seconds, the steel sheet having obtained a maximum heat of 337° Farenheit and the foam a maximum heat of 503° Farenheit, nothing happened. The second test was a duplicate of the first except that the burner was set at 46 BTU/M. At the end of three minutes and fifteen seconds vapor released at the filler hold was not ignited by the candle. At the expiration of an additional thirty seconds, the vapor extinguished the candle. The candle was re-lit and the filler hole ignited and continued to burn with a maximum foam temperature of 470° Farenheit obtained at the end of eight minutes. The third test duplicated the first, except that the candle was placed two and a half inches in front of the filler hole. At the end of six minutes, light smoke was noted at the filler hole; in three minutes and fifty seconds more, light gas was noted at the filler hole. At the end of ten minutes and twenty-three seconds, escaping gas extinguished the candle. When re-lit, the gases did not ignite. At the end of fifteen minutes, an attempt to ignite the filler hole several times failed in that the gases would burn three or four seconds and self-extinguish. A maximum foam temperature of 501° Farenheit was obtained at the end of twelve minutes. In the fourth test, the candle was placed two inches in front of the filler hole which was taped to shut off air. At the end of seven minutes and thirty seconds, gases escaped across the candle flame but did not ignite. At seven minutes forty seconds, the released gases extinguished the candle. At seven minutes fifty seconds, the candle was re-lit and ignited the filler hole. Taping was stopped at nine minutes and ten seconds with a maximum foam temperature of 630° Farenheit obtained at five minutes. In the fifth test a ⅜ inch tyril burner with no air mixing and a gas flow of 28 BTU/M was positioned four and one-half inches below the surface of the sheet metal with flame impinging one inch from the side. Up to seven minutes and thirty seconds, smoke was noted with no ignition. From seventeen minutes and fifteen seconds up through twenty-eight minutes and twenty seconds, there would be momentary burns at the pour hole. A maximum foam temperature of 488° Farenheit was obtained at ten minutes. In a sixth test, with a gas flow of 64 BTU/M from a meeker burner located at three inches below the metal panel and with flame impinging one inch from the filler hole, smoke was visible at the end of fifteen seconds, flame at thirty-five seconds; with the burner removed, flame contained for one minute and ten seconds and died; when the burner was again applied, flame occurred in forty-five seconds, continued to burn when the burner was removed at the end of two minutes and fifteen seconds, dying out at the end of eight minutes eight seconds into the experiment. With flame re-applied, burning at the filler hole began again in two minutes, continued for six minutes and thirty seconds when the burner was shut off, with flame continuing for thirty-four seconds before dying out. A maximum foam temperature of 305° Farenheit was achieved at the end of sixteen minutes.

The next five tests were run on three separate 17 cubic feet Sears Coldspot freezers. The first test was in a sealed room, monitored for temperature and smoke density. A 23 hole pipe burner was positioned three inches up the back of a freezer, centered over the filler hole one and a half inches from the outer metal skin and set at 74 BTU per hour. A 9 hole pipe burner, furnishing heat at 1200° Farenheit, was

positioned below the unit just behind the filler hole so that flaming from the burner swept under the freezer. A pilot light set at 10,500 BTU per hour was impinged on both sides of the filler hole. Flaming began on the bottom surface in fifty-five seconds. At the end of one minute and fifteen seconds into the test, a flaming drip, white, was noted; at the end of two minutes, flame appeared at the filler hole; at the end of three minutes gas released at the filler hole and ignited with yellow fire, tapering off at the end of seven minutes. The room was filled with smoke caused by the degradation of the foam. Maximum smoke density was attained at the end of eleven minutes with visibility at 4.5%, and a maximum temperature in the room of 111° Fahrenheit. The second test was a duplicate of the first except that transite sheets were used behind and below the freezer, the 23 hole burner was placed 5″ up the back of the freezer with the 9 hole burner at the bottom, and the room exhaust was on throughout the test. The burner reached a temperature of 1100° Farenheit. Flames were noted at the back in one minute, at the end of six minutes, flames extended six inches above the rear of the freezer, in ten seconds more gases were visible on the right side of the freezer; at the end of seven minutes and thirty-nine seconds, the gases ignited, projecting out from the front of the freezer varying in length from six inches to twenty-eight inches. At the end of nine minutes and forty seconds, the gasket at the top of the freezer began to burn until the gas was cut off at the end of eighteen minutes. In this test a power cord was placed below the flame source. Its insulation is not flammable according to Seib, but will melt. In this test the cord did not ignite.

In the third freezer test Seib undertook to ignite the foam by maintaining an electrical arc to the back casing, wired to a fusable circuit, with one end of the power cord taped to the back of the freezer. With a 15 amp fuse a contact wire to the steel panel produced a short, blew the fuse instantly and fused the copper wire to the panel. With 20 amp and 30 amp fuses,

there was an instantaneous short with no sustained arcing to the panel. Using a Miller Thunderbolt 2251 Holiaric Welder, with a 50 amp fuse, several arcings were attempted with no ignition to foam. With a 75 amp fuse, the arc cut a hole in the panel and a tape holding the power cord to the panel caught on fire and burned for a few seconds. The cord did not burn. With a 100 amp fuse, the whole was broadened, and the foam ignited for twenty-one seconds, only a small flame being visible. With a 150 amp fuse, combustible gases burned at the filler hole for about thirty seconds. With the same fuse and the weld at a new area in one place, the foam burned for thirteen seconds and at another area burned for four seconds.

In the last two tests, Seib attempted to determine if a blow out or explosive noise could be obtained with more intense heating on the back of the freezer in one test and on the front of the freezer in the other. A 17 hole burner, reaching a temperature of 1400° Farenheit, with a flow of 78,300 BTU per hour was mounted fifteen inches above the filler hole with a transite sheet behind the freezer. Thirteen seconds after ignition, metal expansion noises were heard with no explosive noises. A temperature censor cut off the gas supply at the end of five minutes and thirty-eight seconds. With the burner lowered to five inches, the foam reignited and smoke exuded out of the gasket area. With the burner lowered to one inch above the filler hole, the foam dripped and flamed, diminishing after six minutes. When the gas flame was extinguished, the filler hole continued to burn for twenty seconds.

Sears' last witness was Howard Brehm, Jr., for the last eighteen years the director of product safety for Whirlpool at Benton Harbor, Michigan. He identified the Pitts' freezer as having been manufactured for Sears at Whirlpool's division at St. Paul, Minnesota. Brehm has a graduate degree in chemical engineering and is certified in that field. He belongs to numerous related societies including safety councils, identifying one as "Z–21", which establishes nation-

al standards for gas burning products. He has written articles in trade journals, and in the early 1960's developed a three-man life support system for manned space vehicles, adopted in the Mercury and Apollo flights. He claims to be heavily oriented toward product safety, and conducts seminars in product safety in home appliances. He is also experienced in the study of fire prevention. He is called upon by Whirlpool to reconstruct and determine the cause of fires attributed to Whirlpool products. He was familiar with the type of freezer purchased by the Pittses. He stated that Whirlpool has used polyurethane rigid foam as insulation in its freezers since 1962 and there have been no major changes in the chemical content since. Prototypes are inspected and approved by Underwriters Laboratory. In describing the make-up of the freezer he said the inside liner is made up from 20 gauge cold rolled steel sheets purchased from steel mills, as is also the outer shell with the sides and bottom welded. The defrost wires are looped four times around the inner shell. The defrost wiring is coiled with a fiber glass center, around which is wrapped a resistance wire of copper which is not conductive. The fiber glass is rigid and not subject to stretching. A silicone rubber sleeving is extruded around the fiberglass. Ten inches from either end of the wiring is copper wire, leaving two ends cold, with a heating wire in between. Aluminum tape secures the defrosting wire in its loops around the inner casing of the freezer. The defrost wire hooks up with the defroster switch located inside the lid of the freezer. The defrost system is tested for 120 volts of electricity. It also has a bi-metal thermostat set to break the current if the ambient temperature exceeds 95° Farenheit. Brehm said he tested the defrost wiring during the trial with an ohmmeter and it did not have continuity as it was broken. However, he said all other wiring was all right. As to the switch, it is connected to a knob which must be manually pulled to activate the system. It has a common connector with two exits or different terminals. There is no way for the switch to be activated when the lid is closed

properly. The switch is machine made, and when taken apart is almost impossible to fit back together. Brehm said when the switch fell apart in Dr. Carley's hand and had been put back together, it was still operable as determined by Brehm's use of an ohmmeter some twenty-five times during the trial. In his opinion, if the freezer had sat in a garage in Starkville during the preceding year it was conceivable that the behavior of the switch would be erratic. Using the wiring diagram of the freezer to illustrate, Brehm said current goes through the left side to the defroster switch, then to the bi-metal thermostat. When he put a bag of dry ice in the inner liner reducing the temperature below 50° Farenheit, the ohmmeter showed continuity. When he applied hot air from a hair dryer to over 95° Farenheit, ohmmeter readings showed a break in continuity. For the defrosting system to activate automatically the lid would have to be left open and the switch be broken. Even then, if temperature exceeded 95°, the thermostat would break the current. From tests he was familiar with, the defrost system would have to run 98 hours for the wiring to achieve a temperature of 196° Farenheit. Maximum heating obtained after 192 hours was 205° Farenheit with a maximum voltage of 128 volts. As the foam does not begin to pyrolyze until a heat of 482° Farenheit, Brehm said there was a 280° safety leeway. He also said the defroster wire cannot kink. It is applied by machine to the inner liner and inspected before being buried in the liquid foam next to the inner line. When the foam solidified, the wiring is equally rigid. In his opinion, if the wire did kink, if the kink was overlooked in an inspection, if the switch was defective, and, if the thermostat failed, there would still be only localized heating which would break the tiny wire in the center of the defroster wire, opening the circuit, and all electricity would cease. And as Brehm pointed out, the polyurethane next to the inner liner around which the defroster wires were looped was not damaged or degraded. Of the over thirteen pounds of insulation between the two liners, only that polyurethane next to the outer

liner showed charring in configuration with the burn pattern obvious on the rear panel and bottom of the freezer. Continuing with his account of the method of freezer construction, polyurethane is injected into two filler holes, one in the bottom panel near the front and one in the bottom panel near the rear. The filler holes are left open deliberately to prevent air pockets. When the cavity has been filled, a mechanical arm wipes across the liner closing these vents. All other attachments are then made, including the compressor, and the machine then taken to the testing department. Whirlpool buys the extension or power cords which Whirlpool installs. In the testing function each freezer is tested for 150 volts of current in its electrical systems, visually inspected, and then activated and run until it has been determined to be successfully cooling. Every hundredth freezer goes through special tests, including for safety. There is also a random test from a freezer lot, where all switches, wires and component parts are specially tested. If a defect is found, the whole lot is suspect.

Brehm's first knowledge of the fire in the Pitts' home was in late 1974 after suit was filed in October 1974. In May 1975, he and a Whirlpool products engineer visited the home in Ellisville. They examined the home for the fire damage in the dining room, kitchen and attic in the presence of plaintiffs' attorney. Because the burned areas were being repaired with new wallboard and new floor tile, Brehm asked for permission to remove same which was granted. The underlying burn around the space heater and freezer are reflected in defendant's photographs. They had photographs taken which are in evidence on behalf of the defendant. They drove to Starkville to look at and photograph the freezer in Didlake's garage. During his testimony, Brehm again looked at the two sections of the power cord, and, except where burned, said it appeared to be in as good condition as when it left the factory. As to the two service ports on either side of the compressor, Brehm admitted they would not have been put on at the factory. Their presence indicated to him that the

machine had been serviced after it left production. Returning to his inspection of the home, he noted the burn pattern on the floor and behind the kitchen space heater. The heater itself had been removed but its connections were still present. He particularly noted the flared end of the copper tube gas supply line, as reflected in defendant's exhibit No. 62. Inside the flared end, he found a soft, carbon residue. From his thirty years' experience related to gas appliances, and his last ten years' experience in fire prevention, this soft carbon demonstrated to him that fire occurred in the flared end upstream of the heater itself. He said if the space heater had been properly connected, there would have been no carbon deposit.

Returning to his examination of the freezer, with the permission of the plaintiff, Brehm said he had a portion of the charred polyurethane sent to Dr. Frisch for examination. During his testimony he drew on a blackboard a wiring diagram showing the defroster wire with electricity coming in the freezer from a common terminal to the defroster switch, then past the bi-metal thermostat, looping four times around the inner box and returning to the common terminal. Under this circuitry, he said a short in the defroster wire would not affect the system and heating would continue. The Court notes that Mrs. Pitts said she had never activated the defrost switch by pulling the knob that did so. As to an arc on the back of the outer liner, and, assuming that the power cord was damaged, Brehm said if either wire, with its insulation gone, touched the metal liner, nothing would happen. If both wires, with the insulation gone, touched the back of the freezer, an arc would occur immediately breaking up to a 20 amp breaker. He further stated that an arc between copper and steel would have left a deposit of copper with a blue discoloration. He did not take scrapings from the outside liner, but found no traces of copper from his visual inspection. Even had an arc occurred producing intense heat, Brehm said an arc is instantaneous, not sustaining, and the intense heat would not have been

transmitted to the back of the freezer long enough to initiate pyrolysis or flame.

Finally, Brehm was asked for his expert opinion as to what caused the fire that resulted in the death of plaintiffs' son. He admitted in a deposition taken before the trial that he thought heat from the attic fire had caused a combustible substance in the attic to fall down through the hole in the dining room ceiling to behind the freezer, but, after he learned from Mrs. Pitts' deposition that the attic fire occurred some three hours after the fire in the dining room and kitchen, and that firemen had chopped the ceiling hole during the second fire, he changed his opinion. From his examination of the physical evidence, the photographs, and having heard the evidence during the trial, it was his opinion that natural gas escaped from a loose connection entering into the space heater. As the gas accumulated, it drifted into the dining room and was ignited from a spark from the terminals on the freezer compressor. It did not necessarily enter the bedroom to be exposed to the pilot light in the hot water heater. Once ignited, the burning gas traveled back to its source faster than its supply producing a low order of explosion. Ignition or flame around the heater occurred when the gas pressure at its source equalized with the returning flame. He said that natural gas flame is blue until aerated when it becomes yellowish. In his opinion the burn around the heater and on the wall behind was a typical natural gas fire. His explanation of the fire in and around the freezer was that combustible matter of some sort laying on the floor behind the freezer caught fire from the exploding natural gas, burning long enough to damage the extension cord and heat the back metal panel of the freezer sufficiently to initiate pyrolysis of the foam and some combustion which eventually burned itself out. He said that a freezer is not built to be exposed to escaping natural gas, nor are other appliances such as refrigerators and air conditioners. He conceded that the fire later in the day in the attic was an aftermath of the morning fire.

By way of rebuttal, Mrs. Pitts returned to the stand to deny that there was any flammable matter or debris behind the freezer, saying she swept the dining room floor, including behind the freezer every day. She also denied that the door from the kitchen into the bedroom was closed, saying that it was open when she was last in the kitchen before the fire, and it was hard to close because the bottom of the door dragged on the carpet.

It became apparent to the Court throughout this eight day trial and at its conclusion that no one, lay witnesses or experts, actually knew how this fire, resulting in tragedy, started. The experts, both for the plaintiffs and the defendant, with the benefit of the lay testimony and their own inspections of the freezer and the house, after the fire, as reflected in the numerous photographs in evidence, each had his own theory within the realm of his expert knowledge. The plaintiffs' experts were hampered in that they were not timely advised of the charred floor and wall behind the space heater in the kitchen, the charring and burn being equal if not more than that behind the freezer and on the dining room wall. Sears and Whirlpool had no knowledge that their freezer was suspected as the culprit until four years after the fire when their experts found the house partially repaired and the space heater gone. Nonetheless their respective theories elicited during the well-tried case have presented issues to be resolved by the Court as difficult as that presented to Solomon with all his wisdom.

■■■ The Court initially concludes that plaintiffs may not recover on their negligence theory based on negligence in the design of the freezer, and negligence in the installation of the freezer. Plaintiffs, through Dr. Carley and Schneider, claimed that the design of the freezer was negligent in that it was designed to contain polyurethane, a dangerously flammable substance, as its insulation. The evidence, however established that since 1962 to the present, this substance has been used by all manufacturers of freezers, and was in 1969 at the time this freezer was manufactured, and its

production is yearly increasing for similar uses. Plaintiffs wholly failed to show that such use in 1969 was in disrepute, or that manufacturers at that time had adopted the addition of flame retardants to the formula. Mr. Brehm testified that Whirlpool had recently added a flame retardant to its foam. But what has occurred recently is not the test. See *Ward v. Hobart,* Miss., 450 F.2d 1176, 1182, and *Fincher v. Ford Motor Co.,* D.C., 399 F.Supp. 106, 114, wherein this Court had occasion to cite the rule as announced in *Ward.* Plaintiffs' claim of negligence in the installation of the freezer by Sears' employees is based on the fact that when they added a two prong adapter with a "pig-tail" ground wire to the extension cord to fit the Pitts' two-hole receptacle they failed to ground the pig-tail. However, the experts for both plaintiffs and defendant who addressed their testimony to this feature, agreed that the failure to ground was immaterial to the aspects of this case.

As to the breach of express or implied warranty in the failure of the freezer to perform in the manner for which it was intended, as pointed out by the defendant, the Mississippi wrongful death statute,[3] which specifically created a cause of action in the decedent's parents as next of kin, applies only to three categories of liability for death. The first two are both tortious, (1) a wrongful negligent act or omission or (2) death caused by unsafe machinery, way or appliances. The third based on expressed or implied warranties is limited to the "purity and fitness of foods, drugs, medicines, beverages, tobacco or any and all other articles or commodities intended for human consumption". The statute has historically been strictly construed,[4] and, as such, has not been construed by a Mississippi court to apply to the circumstances of this case, even though under Section 41A:2–318 of Mississippi's Uniform Commercial Code, Section 75–2–318 of the 1972 Code, a seller's warranty, whether express or implied, extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. In *Edwards v. Sears, Roebuck and Company,* 512 F.2d 276, 290–291, the Fifth Circuit Court of Appeals declined to predict how the Mississippi Supreme Court would rule when faced with similar circumstances.

The Court does find that this action was properly brought under the strict liability in tort theory relating to a defective product as construed by the Mississippi courts beginning with *State Stove Manufacturing Company v. Hodges,* 189 So.2d 113. *State Stove* adopted the principle as it appears in Section 402A of the American Law Institute's Restatement of Torts (Second), pp. 347–348, which is as follows:

§ 402–A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

This statement of the rule is immediately followed by a caveat that the Institute expresses no opinion as to whether the rule

---

**3.** Section 11–7–13, Mississippi Code of 1972.

**4.** *Smith v. Garrett,* Miss., 287 So.2d 258, 260.

applies to the benefit of persons other than users or consumers, such as Mark Howard, who as a paying guest in the Pitts' home was an innocent bystander. However, *State Stove* cites with approval language from Prosser, Torts, pp. 658–661 (3rd E. 1964), as follows:

".   .   . Some of the courts have continued to speak the language of 'inherent danger', but it seems clear that this now means nothing more than that substantial harm is to be anticipated if the chattel should be defective.   .   .   . It is certainly the prevailing view that it extends to any product whatever which, if in fact negligently made, may reasonably be expected to be capable of inflicting injury   .   .   . The conclusion is clear that the <u>duty extends to any one</u> who may reasonably be expected to be in the vicinity of the chattel's probable use, and to be endangered if it is defective." (underscoring added).

Under the circumstances of this case, the Court has no hesitation in holding that Mark Howard was a person to whom this duty was owed. It remains for this Court to determine if the freezer was defective, and if this defect caused the fire that fatally burned the deceased.

In determining the burden of the plaintiffs on proof of a defect, this Court is mindful of language of the Fifth Circuit Court of Appeals in its fairly recent decision in *Price v. Admiral Corp.*, 527 F.2d 412, a case involving a house fire alleged to have resulted from a defect in a freezer. As a diversity case, Mississippi law controlled, as here. The Appellate Court stated:

"There was abundant evidence, direct and circumstantial, from which the jury could infer that a defect existed in the refrigerator, without pinpointing that defect. In *Ford Motor Company v. Matthews*, 291 So.2d 169, 1973, the Mississippi Supreme Court held that it is unnecessary for a plaintiff to prove a specific defect in a product in a cause of action based on strict liability."

The Appellate Court noted that the Mississippi court in *Matthews* quoted with approval an excerpt from 2 Frumer and Friedman, Products Liability, § 16A[A]e, at pp. 3–306 to 3–310, thusly:

"Absolute proof that injury was the result of the defect is not essential, and the burden of proof can be satisfied by showing sufficient facts to allow a jury to infer defective quality and that such defective quality was a substantial element in producing the claimant's injury."

The Appellate Court cited other Mississippi cases in accord with this view and also cited Mississippi cases holding that the causal relation between an agency and an injury can be proved circumstantially.

The initial issue raised by the direct and circumstantial evidence in this case is whether the holocaust that occurred in the dining room and kitchen, short in time as it may have lasted, was triggered by a defect in the freezer or by natural gas escaping from a faulty connection in the space heater which allowed this gas to permeate through to an area behind the freezer and ignite there.

Plaintiffs' experts, Dr. Carley, Schneider and Leininger, each offered his own theory that the freezer contained one or more defects which triggered the fire. Each theory, logical as it may have seemed, depended on one or more factual suppositions that could not be proved. Because of this, defendant contends that each theory supported merely a possibility, one offsetting the others, and therefore there was insufficient evidence to support a probability, necessary to plaintiffs' burden of a preponderance of the proof. The Court, mindful that it is not plaintiffs' burden to pinpoint the causative defect, does not entirely agree, particularly as there was no way for any of these experts to have knowledge of the underlying factual suppositions. For example, Dr. Carley's theory depended on not only a defective switch, but a defect in the defroster wiring that caused a hot spot in the metal casing at the back of the freezer, hot enough to initiate pyrolysis of the polyurethane. There is no question in the Court's mind but that this freezer was not "like new". The defrost switch was held

together by a rubber band. Initially the lid, according to Mrs. Pitts, did not fit tightly enough to prevent cold air escaping. Service ports were present indicating that the freezer had been serviced before its purchase by the Pitts. But one or more of these defects had to be causally related to the injury. Accepting Dr. Carley's theory that there was a defective switch, he also had to assume a hot spot from the defroster wiring, in an area not visible on inspection, as opposed to defendant's proof that no such hot spot could occur in view of the bi-metal thermostat, and a house breaker that was not thrown, and even if one did, in view of defendant's proof that a short in the wire, sustained over a period of time as long as 205 hours did not build up a heat sufficient for pyrolysis to begin. Continuing with Dr. Carley's theory, there still had to be ignition outside the freezer either from the vapors emitted during pyrolysis having to come into contact with the pilot light of the hot water heater when there was no evidence of any burn in that area, or from an arc in the extension cord which had to have been damaged in some way not shown, or from the self-ignition of the polyurethane as its vapors emitted the filler hole. In Schneider's theory, ignition had to come from a damaged extension cord, damaged enough to expose the inner copper wire for it to short or arc against the back of the freezer causing ignition within one second to a minute. Missing from this theory is how Sears could be liable for damage to an extension cord that suddenly became damaged after being in the possession of the Pittses for eleven months. Leininger's theory also depended on a hot spot caused by a short in the defroster wire which he saw broken, only to learn later that this wire was repaired by Dr. Carley who had inadvertently broken it in handling the charred polyurethane. To complete his theory, Leininger, like Schneider, said ignition came from an arc in the extension cord, differing with Schneider only in that Leininger though it took a longer period of time for the heat to build up to 1900° Farenheit, evidenced by the beading in the copper. When confronted with evidence of fire in and around the space heater, all three had to assume that the vapors and/or fire emitted from the filler hole with pressure sufficient to cause an explosive noise, the fire so emitted having to turn a corner and enter the kitchen in order to cause the damage there. Similar to these inferences drawn from the evidence, the Court has wondered if an explosion at the vent hole of the freezer, which according to Mrs. Pitts shook the house, could have jarred loose the connections to the space heater, but no witness on behalf of plaintiffs advanced this theory.

Although any one of the theories of plaintiffs' experts could be persuasive, none is in view of the obvious fact that the kinds of ignition proposed by plaintiffs have. not explained the fire in the kitchen. Under the tests run by Brehm and Seib, pyrolysis, triggered by flame, followed by the application of flame to the resulting combustible vapors, at most, caused a flame of no more than 28 inches in length and resulted in no explosion, in sharp contrast to the flame pattern seen in the photographs which reached as high as the dining room ceiling before swirling toward the kitchen. Further according to the calculations of Frisch and Dr. Thames, the pyrolyzation of no more than two pounds of polyurethane did not emit sufficient combustible vapors to cause an explosive emission and flame comparable to that in the dining room and kitchen.

The Court does view with alarm the admission on the part of the defendant that when a flow of natural gas is exposed to the normal sparking of the compressor of the freezer, an explosion and fire may result. If this is what occurred, defendant claims it is protected by the "second accident" principle as adopted by the Mississippi Supreme Court in cases stemming from *Walton v. Chrysler Motor Corporation*, 229 So.2d 568, such as *Ford Motor Co. v. Simpson*, 233 So.2d 797, and, as upheld in a Mississippi diversity case by the Fifth Circuit Court of Appeals in *Turner v. Big Four Automotive Equipment Corp.*, 511 F.2d 133. This defense is applicable to the circumstances here. Whether defects in the freez-

er caused pyrolyzation of the polyurethane and fire, that fire, alone, did not cause the injuries and death to Mark Howard. It had to be triggered or augmented by fire that had its source from natural gas in and around the space heater. In *Walton* and its progeny, the Supreme Court of Mississippi has followed a limited or narrow path in that it restricts foreseeability to the normal use for which the product was manufactured.

> "The strict liability rule for products liability cases adopted by this Court eliminates the necessity to show negligence in the manufacture of the product where it is shown that the product left the hands of the manufacturer in a defective condition, but this rule does not eliminate the requirement that, even where there is a defect in the product, that there must be some duty owed to plaintiff with regard to the defect, <u>growing out of the intended normal use for which the product was manufactured.</u>" 299 So.2d 573 (Underscoring added).

In the everyday use of gas and electric appliances in the modern household, if it were left alone to this Court to say, it would be constrained to find that if a holocaust could result from the inadvertent or accidental exposure of natural gas to a normal spark in the relay of a freezer compressor, then the industry should be required to prevent such by whatever means it takes to insulate the spark. Moreover, if a defect in the freezer ignited natural gas, this Court would give careful consideration, as it has here, as to whether the defect could rightfully be treated as a contributing cause. It may not do so under the Mississippi rule, cited from *Walton* above.

Accordingly, the Court finds that defendant's motion for dismissal of the action, made at the conclusion of the evidence, should be sustained, and that plaintiffs have no relief against the defendant.

The Clerk is directed to enter a judgment denying relief to the plaintiffs, furnishing a copy of said judgment to all attorneys of record.